**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
HATTIESBURG DIVISION**


**DR. CLINT NICHOLS**                                               **PLAINTIFF**

**VERSUS**                              **CIVIL ACTION NO. 2:08cv128-KS-MTP**

**THE UNIVERSITY OF SOUTHERN MISSISSIPPI, et al.**              **DEFENDANTS**


## <u>MEMORANDUM OPINION AND ORDER</u>

This matter is before the court on a Motion to Dismiss, or, in the alternative, Motion for

Summary Judgment [Doc. # 44], filed on behalf of Defendants. The court, having reviewed the

motion, the responses, the pleadings and exhibits on file and being otherwise fully advised in the

premises, finds that the summary judgment motion should be granted. The court specifically

finds as follows:


## I.  <u>FACTUAL BACKGROUND</u>

Dr. Clint Nichols was a non-tenured faculty member of the School of Music at the

University of Southern Mississippi. Since 1999, he has been a part-time employee and

designated as either an adjunct, visiting, or interim professor. His last employment contract was

for the Fall 2007 Semester and ran from August 20, 2007 through December 14, 2007. Dr.

Nichols had various responsibilities including voice instruction.

In November 2007, following a voice lesson, Dr. Nichols and one of his students, Mr.

Lunsford, engaged in a conversation in the classroom about homosexuality and the entertainment

industry in New York City. Later that same day Lunsford, offended by some of Dr. Nichols's

opinions, returned to confront Dr. Nichols.  Mr. Ward, the accompanist, was present for some of the conversation.  While the specific content of the conversations is disputed, the general topic was about "working with homosexuals and how the New York musical environment is impacted by homosexuality." Compl. ¶ 9 [Doc. #1-2].  Dr. Nichols spent time working on Broadway and contends that he was warning Lunsford that "New York was morally challenging, that AIDS was a severe problem there, and that he should be careful how he handled himself there."  Pl.'s Br. Resp. Mot. Summ. J. 4 [Doc. # 49].    Dr. Nichols contends that he did not know of Lunsford's homosexuality until Lunsford informed him of his sexual orientation in the second meeting.  At some point after learning Lunsford's sexual orientation, Dr. Nichols stated that he would pray for Lunsford.

     That evening, Lunsford spoke to his roommate about his conversation with Dr. Nichols and how it made him feel.  His roommate suggested that he complain to the School of Music. On his roommate's advice, Lunsford reported the conversation to a faculty member, Dr. Kyle.  Dr. Kyle reported the incident to Dr. Dean, her husband and fellow faculty member.  Dr. Dean then reported the incident to Dr. Charles Elliott, the Chair of the School of Music.  Dr. Elliott reported the incident to the Director of Affirmative Action, Dr. Rebecca Woodrick.  Lunsford recited his version of the conversation with Dr. Nichols in an emailed statement to Dr. Woodrick.[1]

     Lunsford reported that Dr. Nichols said several things "that can be seen as inappropriate"

---

[1]Lunsford provided his written statement by email on November 19, 2007, several days after the meeting between Drs. Elliott, Woodrick, and Nichols.  Therefore the actions that occurred in the meeting were based on Lunsford's oral complaint, and not on the contents of the written complaint. Pl.'s Br. Resp. Mot. Summ. J. 19 [Doc. # 49].  Although Lunsford and Nichols debate the exact statements made during their conversations, the Court has not uncovered any allegation that the contents of Lunsford's oral and written complaints to faculty members differ.

and "that hit [him] very hard personally." Defs.' Br. Supp. Mot. Summ. J., Ex. J [Doc. # 45-7].

Lunsford writes:

> [H]e said things such as:
> - it's a proven fact that homosexuals die 20 years early.
> - there is nothing good that comes out of a homosexual relationship.
> - homosexual relationships are full of jealousy drugs and aids.
> - i [sic] don't need the 3% of minorities in this country to tell the rest of us normal people what to believe.
> - homosexuality is a discusting [sic] lifestyle.
> - i'll [sic] pray for you (after i [sic] told him that i [sic] was a homosexual)

*Id.* (bullet points added). Lunsford also reported that Dr. Nichols said he would try to be more sensitive and would not treat Lunsford any differently. *Id.* However, Lunsford felt that it would be "extremely awkward" to remain in Dr. Nichols's studio. *Id.*

On November 16, 2007, Dr. Elliott and Dr. Gillespie, Associate Dean on the College of Arts and Letters, met with Dr. Nichols concerning the incident. At this meeting, Drs. Elliott and Gillespie told Dr. Nichols of the student complaint and that he had violated the University's non-discrimination policy.[2] He was given a copy of USM's policy. Initially, Drs. Elliott and

---

[2]The "University of Southern Mississippi Nondiscrimination Policy Statement" states:

> The University of Southern Mississippi offers to all persons equal access to educational, programmattic and employment opportunities without regard to age, sex, sexual orientation, religion, race, color, national origin, Vietnam era veteran status or disability status. These provisions are pursuant to applicable federal and state regulations. Inquiries concerning discrimination should be directed to the following:
>
> Office of Affirmative Action/ Equal Employment Opportunity
> . . .
>
> The University of Southern Mississippi, in its efforts to foster an environment of respect for the dignity and worth of all members of the university community, is committed to maintaining a work-learning environment free of sexual harassment.

Gillespie told Dr. Nichols that his employment would immediately end, a few weeks short of the end of his contract. However, a short time later, after consulting with Dr. Von Hermann, the Dean of the College of Arts and Letters, Dr. Elliott informed Dr. Nichols that he could complete his current term of employment. Lunsford was reassigned to another teacher. Drs. Elliott and Gillespie contend that at all times they were acting under the direction of Dr. Denise Von Hermann. Defs.' Br. Supp. Mot. Summ. J. 3-4 [Doc. # 45]. Although Dr. Saunders, the President of USM, has the absolute authority to terminate adjunct professors, she has delegated that duty to the Deans, in this case, Dean Von Hermann. Therefore the named individual defendants in this case were only authorized to offer advice and recommendations.

After the meeting, Dr. Nichols finished out his employment contract. Dr. Nichols told several of his students that he would not be coming back after the Fall 2007 Semester. Pl.'s Br. Resp. Mot. Summ. J. 15 [Doc. # 49]. During his last weeks, Dr. Nichols says that news of the incident spread through the School of Music. In his deposition, Dr. Nichols testified that "[m]any people came to me and mentioned it." Pl.'s Br. Resp. Mot. Summ. J., Ex. 4 at 138: 20-21 [Doc. # 49-5]. Dr. Nichols later clarified in his signature sheet that "it" meant the accusations and allegations against him. *Id.*, Ex. 19 [Doc. # 48-20]. Dr. Nichols asserts that he did not tell anyone about the allegations. Dr. Nichols does not present direct evidence that the named Defendants spoke of the allegation with anyone that was not officially involved. However, Dr.

_____

It is the policy of the university that no member of its community shall sexually harass another. Any employee or student who violates this policy is subject to disciplinary action including termination. Sexual harassment is illegal under both state and federal law.

Pl.'s Br. Resp. Mot. Summ. J., Ex. 9 [Doc. # 48-10].

Nichols claims that Defendants did nothing to "prevent or forestall the spreading" of details of the allegations against him. *Id.* at 15. Lunsford was never told to keep the matter confidential. Thus, Dr. Nichols concludes that Defendants "either released [the information] to the public or allowed [it] to be released." *Id.* at 16.

USM did not offer Dr. Nichols a new contract for the Spring 2008 Semester. Dr. Nichols sent several letters to Defendants seeking a "name clearing" hearing. Dr. Nichols claims that he should have been afforded this hearing as a USM employee per the terms of the Handbook and the School of Music policies.[3] Dr. Nichols further contends that Dr. Woodrick was biased and

_____

[3]The School of Music policy sets forth the School's commitment to providing an environment free of harassment that may "impede the academic freedom or diminish the dignity of any member of the University community." The policy directs complaints to either the Director or Associate Director of the School of Music. The policy further states that:

> The School of Music also will take appropriate steps to ensure that a person against whom such a complaint is brought is treated fairly, has adequate opportunity to respond to such accusations, and that findings, if any, are supported by clear and persuasive evidence.
>
> Complaints of sexual harassment shall be handled confidentially, with the facts made available only to those who need to know in order to investigate and resolve the matter.
>
> The complainant and the person complained against will be notified of the final disposition of the complaint.
>
> If a complaint of sexual harassment is found to be substantiated, appropriate corrective action will follow, up to and including the separation of the offending party from the University, consistent with University policies.
>
> If the suggested procedures outlined above do not result in a satisfactory resolution of a complaint, members of the University community retain the right to file formal complaints in cases of alleged sexual harassment.

Pl.'s Br. Resp. Mot. Summ. J., Ex. 7 [Doc. #48-8 at 2-3].
The Handbook includes the "Procedure for the Resolution of Discrimination Complaints:

prejudiced in her investigation or lack thereof, and this led to an unfair decision on the part of the decision-makers, Drs. Saunders and Von Hermann. Dr. Nichols accuses Dr. Woodrick of "ram-rodding this through" without meeting with him, having a "lack of respect," and screaming over the phone that Dr. Nichols was guilty when he called for a statement explaining his termination. Pl.'s Resp. Mot. Summ. J., Ex. 4, Nichols Dep.at 113-115 [Doc. # 48-5].

On April 22, 2008, Dr. Nichols filed the present suit against USM and Drs. Elliott, Saunders, Woodrick, and Gillespie, individually and in their official capacities. Dr. Nichols is suing for relief under 42 U.S.C. § 1983 for violations of his Procedural and Substantive Due Process

_____

The University of Southern Mississippi" which states: "Employees and students are encouraged, where feasible, to reach an informal resolution to complaints through the administrative reporting structure of the academic or employment unit. However, if the complainant wishes to access a formal process instead, the following procedures apply." The formal process requires submission of a written complaint to the Office of Affirmative Action ("Office of AA/EEO") within thirty days of the alleged violation, followed by a determination by the director of the Office of AA/EEO whether a violation has occurred, whether the incident should be further investigated or mediated, and whether a course of discipline should be recommended to the appropriate vice president. The Procedure also outlines an appeals process. Additionally, the Procedure addresses confidentiality and retaliation:

> CONFIDENTIALITY: Complaints filed with the University will remain confidential to the extent allowed by law, while also allowing for a complete investigation. University personnel involved in or responsible for any aspect of a complaint, including the appeals process, shall maintain confidentiality throughout the processing of the complaint. All persons involved in the complaint process are expected to maintain confidentiality, both during the process and afterward.

> RETALIATION: The University seeks to create an environment where students and employees are free to explore the possible violation of their civil rights without fear of reprisal. Retaliation is illegal and will not be tolerated by the University. Similarly, persons who use this process to bring bad faith allegations against an employee may be subject to disciplinary action.

Pl.'s Br. Resp. Mot. Summ. J., Ex. 8 [Doc. # 48-9].

Rights under the Fourteenth Amendment, Equal Protection Rights, and First Amendment Rights. Compl. ¶ 4. He also raises a state breach of contract claim and violation of Mississippi's Due Process Clause. Compl. ¶¶ 5, 14. Defendants removed the case to federal court, and filed their Motion to Dismiss, or in the Alternative, Motion for Summary Judgment. [Doc. #44].

## II. STANDARD OF REVIEW

The Federal Rules of Civil Procedure, Rule 56(c) authorizes summary judgment where "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 91 L.Ed.2d 265, 106 S.Ct. 2548 (1986). The existence of a material question of fact is itself a question of law that the district court is bound to consider before granting summary judgment. *John v. State of La. (Bd. of T. for State C. & U.)*, 757 F.2d 698, 712 (5th Cir. 1985).

A Judge's function at the summary judgment stage is not himself to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment is appropriate. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 91 L.Ed.2d 202, 106 S.Ct. 2505 (1986).

Although Rule 56 is peculiarly adapted to the disposition of legal questions, it is not limited to that role. *Prof'l Managers, Inc. v. Fawer, Brian, Hardy & Zatzkis*, 799 F.2d 218, 222 (5th Cir. 1986). "The mere existence of a disputed factual issue, therefore, does not foreclose

summary judgment. The dispute must be genuine, and the facts must be material." *Id.* "With regard to 'materiality', only those disputes over facts that might affect the outcome of the lawsuit under the governing substantive law will preclude summary judgment." *Phillips Oil Co. v. OKC Corp.*, 812 F.2d 265, 272 (5th Cir. 1987). Where "the summary judgment evidence establishes that one of the essential elements of the plaintiff's cause of action does not exist as a matter of law, . . . all other contested issues of fact are rendered immaterial. *See Celotex*, 477 U.S. at 323; *Topalian v. Ehrman*, 954 F.2d 1125, 1138 (5th Cir. 1992). In making its determinations of fact on a motion for summary judgment, the Court must view the evidence submitted by the parties in a light most favorable to the non-moving party. *McPherson v. Rankin*, 736 F.2d 175, 178 (5th Cir. 1984).

The moving party has the duty to demonstrate the lack of a genuine issue of material fact and the appropriateness of judgment as a matter of law to prevail on his motion. *Union Planters Nat'l Leasing v. Woods*, 687 F.2d 117 (5th Cir. 1982). The movant accomplishes this by informing the court of the basis of its motion, and by identifying portions of the record which highlight the absence of genuine factual issues. *Topalian*, 954 F.2d at 1131.

Once a properly supported motion for summary judgment is presented, the nonmoving party must rebut with "significant probative" evidence. *Ferguson v. Nat'l Broad. Co., Inc.*, 584 F.2d 111, 114 (5th Cir. 1978). In other words, "the nonmoving litigant is required to bring forward 'significant probative evidence' demonstrating the existence of a triable issue of fact." *In Re Mun. Bond Reporting Antitrust Lit.* , 672 F.2d 436, 440 (5th Cir. 1982). To defend against a proper summary judgment motion, one may not rely on mere denial of material facts nor on unsworn allegations in the pleadings or arguments and assertions in briefs or legal memoranda.

The nonmoving party's response, by affidavit or otherwise, must set forth specific facts showing that there is a genuine issue for trial. FED.R.CIV.P. 56(e); s*ee also Union Planters Nat'l Leasing*, 687 F.2d at 119.

While generally "[t]he burden to discover a genuine issue of fact is not on [the] court," *Topalian* 954 F.2d at 1137, "Rule 56 does not distinguish between documents merely filed and those singled out by counsel for special attention-the court must consider both before granting a summary judgment." *John*, 757 F.2d at 712 (quoting *Keiser v. Coliseum Prop., Inc.*, 614 F.2d 406, 410 (5th Cir. 1980)).

### III.  LAW AND APPLICATION

### A. DR. NICHOL'S § 1983 CLAIMS

42 U.S.C. § 1983 creates a private cause of action for violations of Constitutional rights perpetrated by any person acting under color of State law.  The plaintiff must establish, as a prerequisite to maintaining a § 1983 claim, that: (1) the defendants were acting under color of state law, and (2) that while acting under color of state law, the defendants violated rights of the plaintiff that are protected by the United States Constitution or laws of the United States. *Parratt v. Taylor*, 451 U.S. 527, 535, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981); *Augustine v. Doe*, 740 F.2d 322, 324 (5th Cir. 1984).

USM, as a state entity, and the individual defendants in their official capacities are not subject to suit under § 1983.  State and state agencies are not within the class of potential defendants under § 1983. *See Suddith v. Univ. of S. Miss*, 977 So.2d 1158, 1168 (Miss. App. 2007)(citing *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d

45 (1989)).  "[A] suit against a state official in his or her official capacity is not a suit against the official but rather a suit against the official's office" and is "no different from a suit against the State itself."  See *Will*, 491 U.S. at 71.  Therefore, the remaining defendants cannot be sued in their official capacity for money damages, because they are state officials.

Section 1983 claims against public officials as individuals are subject to the defense of qualified immunity.  *Foley v. Univ. of Houston System*, 355 F.3d 333, 338 (5th Cir. 2003).  "Qualified immunity attaches only to officials in their individual, not their official, capacities." *Id.* at 337.  The Fifth Circuit has held that "government officials performing discretionary functions are protected from civil liability under the doctrine of qualified immunity if their conduct violates no 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Sorenson v. Ferrie*, 134 F.3d 325, 327 (5th Cir. 1998)(quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)).

Under the two step analysis employed by the Fifth Circuit in reviewing claims wherein qualified immunity has been asserted, the court must first determine "whether the plaintiff has asserted the violation of a clearly established constitutional right.  If so, the court decides whether the defendant's conduct was objectively reasonable." *Sorenson*, 134 F.3d at 327 *(*quoting *Coleman v. Houston Indep. Sch. Dist.,* 113 F.3d 528, 533 (5th Cir. 1997)(applying the two-prong test of *Siegert v. Gilley*, 500 U.S. 226, 231-32, 111 S. Ct. 1789, 114 L. Ed. 2d 277 (1991)).  The first step "is subdivided into three questions: (1) whether a constitutional violation is alleged; (2) whether the law regarding the alleged violation was clearly established at the time of the alleged violation; and (3) whether the record shows that a violation occurred." *Dudley v. Angel*, 209 F.3d 460, 462 *(*quoting *Kerr v.Lyford,* 171 F.3d 330, 339 (5th Cir. 1999)(citing *Rich*

*v. Dollar*, 841 F.2d 1558, 1563 (11th Cir. 1988))).

Dr. Nichols claims several constitutional violations including violation of his substantive and procedural due process rights, violation of Equal Protection, and First Amendment retaliation. Each are addressed in turn below to determine if there was a violation of clearly established constitutional rights.

### 1. Protected Property Interest & Due Process

Defendants argue that Plaintiff cannot show deprivation of a protected liberty or property interest. Without such a property interest, "no right to due process can accrue." *Pruett v. Dumas*, 914 F. Supp. 133 (N.D. Miss. 1996)(citing *Moore v. Miss. Valley State Univ.*, 871 F.2d 545, 548 (5th Cir. 1989)). To have a right protected by federal due process, Plaintiff must first have a right established under state law or university policies. *Bd. of Regents of State Coll. v. Roth*, 408 U.S. 564, 566-67 (1972); *Hall v. Bd. of Trustees of State Inst. of Higher Learning*, 712 So. 2d 312, 321 (Miss. 1998).

Both parties agree that Dr. Nichols, a non-tenured professor, had no property interest in continued employment at USM. Neither Mississippi law nor university policy establishes a property interest in continued employment for non-tenured professors. *See Whiting v. Univ. of S. Miss., et. al.,* 451 F.3d 339, 344-45 (5th Cir. 2006); *Suddith v. Univ. of S. Miss., et al.*, 977 So.2d 1158 (Miss. App. 2007) (citing *Hall v. Bd. of Trustees of State Inst. of Higher Learning*, 712 So.2d 312, 230 (Miss. 1998). Defendant states in his own Brief that "[h]e is not contending he is entitled to continued employment." Pl.'s Br. Resp. Mot. Summ. J. 2 [Doc. # 49].

Instead, Dr. Nichols argues that USM, through its handbook, the School of Music policies, and the University's Non-Discrimination Policy, created rights and entitlements to a hearing and

appeals process for violation of the discrimination policy. Dr. Nichols characterizes the right to these procedures as "property rights." Br. Resp. Mot. Summ. J. 12 [Doc. # 49]. "Mississippi courts have held that contract rights constitute enforceable property rights." *Whiting*, 451 F.3d at 345 (5th Cir. 2006) (citations omitted). Employee manuals and the procedures can be adopted as part of the employment contract. *Id.* at 345-46. An employer must abide by its own handbooks and manuals. *See Bobbitt v. The Orchard, Ltd.*, 603 So.2d 356, 362 (Miss. 1992). For instance, if the handbook specifically provides the procedure and discipline for a particular infraction, the handbook should be followed. *Id.* at 361. However, grievance procedures in a handbook will not override an at-will employment status where that status has been expressly stated in the contract between the employer and employee. *See Byrd v. Imperial Palace of Miss.*, 807 So.2d 433, 438 (Miss. 2002). The law still remains that a school "may refuse to rehire a teacher for good reason, for bad reason, or for no reason at all" as long as the decision is not based on "legally impermissible considerations." *Miss. Employment Sec. Comm'n v. Philadelphia Mun. Separate Sch. Dist. of Neshoba County*, 437 So.2d 388, 397 (Miss. 1983).

Dr. Nichols's argument is flawed for several reasons. First, the University has expressly reserved its rights to non-renew non-tenured faculty members, including adjunct, interim, or visiting professors. The Handbook specifically provides that "the Board of Trustees does not obligate itself . . . to maintain such positions or to continue the employment of the individuals filling them beyond the expiration of the contract or agreement with the external entity." Defs.' Br. Supp. Mot. Summ. J., Ex. I [Doc. # 45-6]. This right is reiterated in the Boards' Policies and Bylaws: "Individuals employed in non-tenure track positions have no expectation of continuing employment beyond the expiration of their contracts." *Id.*, Ex. L [Doc. # 45-7]. Establishing

procedures to fairly handle sexual harassment/discrimination allegations in no way obligates the Board or the university to provide due process to an employee that they wish to non-renew.

Second, even if Dr. Nichols had a right to this process, it is not clear that the processes would apply in Dr. Nichols's situation. The "Procedure for the Resolution of Discrimination Complaints" allows that "any employee, student, applicant for admission or employment, or other participant in the University's programs or activities who believes s/he has been unlawfully discriminated against on the basis of age, color, sex, sexual orientation, race, religion . . . by a University employee may file a complaint with the Office of Affirmative Action." Pl.'s Resp. Mot. Summ. J., Ex. 8 [Doc. # 48-9]. The Procedure then encourages informal resolution of the complaint where feasible, but provides additional procedures if "the *complainant* wishes to access a formal process instead." *Id.* (emphasis added). The complaint here was one made by a student against a University employee alleging sexual orientation harassment/discrimination. The policy, by its plain language, creates a reporting and resolution structure for the victim of discrimination, not for the accused. There is no indication that Lunsford, the complainant, sought resolution through a formal hearing process. Therefore, even if Dr. Nichols had a right to these procedures, he was not factually entitled in this instance to any of the procedures outlined in the policy because he was accused of sexual harassment/discrimination and was not the complainant.

Lastly, even if USM's procedures constituted a property interest warranting due process and are available equally to the complainant and the accused, contrary to the plain language of the policy, Dr. Nichols has not shown that the procedures were not followed. USM explicitly encourages informal resolution of complaints through the academic unit's reporting structure,

where feasible.  The School of Music's Policies and Procedures further states that they "will take appropriate steps to ensure that a person against whom such a complaint is brought is treated fairly, has adequate opportunity to respond to such accusations, and that findings, if any, are supported by clear and persuasive evidence."

In this case, the formal process was not triggered.  Dr. Nichols provides no evidence that Lunsford filed an official complaint to the Office of Affirmative Action.  The evidence shows instead that Lunsford verbally reported the incident to Music School faculty, that Lunsford sent a written statement via email, and that the allegations were addressed in the meeting with Drs. Nichols, Elliott, and Gillespie.  This meeting provided Dr. Nichols a chance to respond to the allegations against him.  Despite the initial decision that Dr. Nichols should be separated from USM, the result of this meeting was instead to allow Dr. Nichols to finish out his contract period and to reassign Lunsford to another voice instructor.  In other words, the complaint was resolved informally in compliance with USM procedures and Dr. Nichols was given the opportunity to respond to the allegations against him.

Dr. Nichols argues that he was denied a fair hearing because Dr. Woodrick was not an unbiased decision-maker.  Specifically, he alleges that she determined his fate before he was given an opportunity to present his side of the story and that she was hostile when he spoke with her on the phone regarding his rights to a hearing.  Dr. Nichols is not arguing that allowing him to finish his contractual term was unfair, or that reassigning Lunsford was unfair, but that the decision to non-renew him without a hearing was unfair.  However, "'[w]e have never held that it is a violation of the Constitution for a government employer to discharge an employee based on substantively incorrect information.'"  *Engquist v. Oregon Dep't of Agric.,et al.*, 128 S.Ct. 2146, 2155, 170 L.Ed.2d 975 (2008) (quoting *Waters*, 511 U.S. at 679, 114 S.Ct. 1878 (plurality

opinion)); *see also Connick*, 461 U.S. at 146-47, 103 S.Ct. 1684 ("[O]rdinary dismissals from government service ... are not subject to judicial review even if the reasons for dismissal are alleged to be mistaken or unreasonable" (citing *Bd. of Regents of State Coll. v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33L.Ed.2d 570 (1972); and *Bishop*, 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed. 2d 684))). Additionally, Dr. Woodrick was not the ultimate decision-maker but was only making recommendations to Drs. Von Hermann and Saunders. Therefore, Dr. Woodrick's bias or prejudice towards Dr. Nichols, even if proven, is not sufficient evidence of a deprivation in a protected property interest in the procedures established by the handbook.

Dr. Nichols has failed to demonstrate a genuine issue that even if he was entitled to the procedures, that USM somehow failed to comply with them. In sum, Dr. Nichols cannot take a university procedure to safeguard victims of discrimination and harassment and morph it into a protected property interest in a non-renewal hearing. Dr. Nichols has failed to show a deprivation of a protected property interest, and therefore has no entitlement to procedural due process.

### 2. Protected Liberty Interest & Due Process

Dr. Nichols next contends that he is entitled to a hearing to clear his name because Defendants' actions violated his protected liberty interest in his reputation. A discharged employee may be entitled to notice and an opportunity to be heard if the actions against him puts his good name, reputation, honor, or integrity at stake. *See Hughes v. City of Garland*, 204 F.3d 223, 226 (5th Cir. 2000) (quoting *Roth*, 402 U.S. at 573)). To prove a violation of one's liberty interest by denying a name clearing hearing, the plaintiff must meet the "stigma-plus infringement test." *See Bledsoe v. City of Horn Lake, Miss.*, 449 F.3d 650, 653 (5th Cir. 2006).

Namely the plaintiff must show: "(1) that he was discharged; (2) stigmatizing charges were made against him in connection with the discharge; (3) the charges were false; (4) he was not provided notice or an opportunity to be heard prior to the discharge; (5) the charges were made public; (6) he requested a hearing to clear his name; and (7) the employer denied the request." *Id.* To show that the charges were stigmatizing, the plaintiff must show more than just damage to reputation or the stigma of being discharged. Instead, the plaintiff must show that he was discharged in a manner that created "a false and defamatory impression about him and thus stigmatizes him and forecloses him from other employment opportunities." *Id.* To show that the allegations were publicized, the plaintiff must show that "the agency has made or is likely to make the stigmatizing charges public in any official or intentional manner, other than in connection with the defense of the related legal action." *Whiting*, 451 F.3d 339, 347 (5th Cir. 2006)(citations omitted).

Dr. Nichols satisfies elements (6) and (7) because he did request a hearing and was denied. But, Dr. Nichols fails to present evidence to prove the other elements. First, he was not terminated, but was non-renewed after being allowed to finish his contractual term, thus failing to meet element (1). Second, while the charges may have damaged his reputation with some, Dr. Nichols has not presented evidence that the charges created a false impression of him. Dr. Nichols does not dispute that the subject matter involved his views on homosexuality or that some of the comments made Lunsford uncomfortable. Further, Dr. Nichols has not provided any evidence that he has been foreclosed from any employment opportunities. Dr. Nichols asserts that he has been "banned permanently from ever even applying for employment at the University of Southern Mississippi." Pl.'s Br. Resp. Mot. Summ. J. 1 [Doc. # 49]. However, he presents no evidence to support this contention other than an email from Dr. Woodrick to Dr. Saunders

that states that she will "recommend to Dr. Von Hermann that we not allow Dr. Nichols to be hired by USM again." Pl.'s Br. Resp. Mot. Summ. J., Ex.1 [Doc. #48-2]. A university employee's written intent to recommend to the ultimate decision-maker that a person should not be eligible for rehire is not adequate proof of an official decision to ban Dr. Nichols from all future employment with USM. Therefore Dr. Nichols's evidence fails as to elements (2) and (3).

Third, Dr. Nichols was given notice of Lunsford's allegations in his meeting with Drs. Elliott and Gillespie and had an opportunity in that meeting to tell his version of events two weeks before his non-renewal. Therefore Dr. Nichols has failed to demonstrate sufficient evidence to prove element (4).

Finally, Dr. Nichols has not presented adequate evidence that the charges were made public. He presents no evidence that the allegations against him were officially released. Instead, he asserts that Defendants intentionally allowed the release of the allegations by not advising Lunsford to keep his complaint confidential. In short, Dr. Nichols would assign to the Defendants the duty of rumor control. This Court knows of no case that imposes such a duty on an employer. Further, the accompanist that witnessed the conversation or Lunsford's roommate in whom Lunsford confided before complaining to faculty, could have been the source of the rumors circulating through the department. Dr. Nichols presents no evidence that the faculty members involved in the investigation intentionally or officially released the information. In fact, the incident was not documented in Dr. Nichols's personnel file and therefore would not be released to future employers. Dr. Nichols has failed to provide any evidence to support element (5). In conclusion, Dr. Nichols has not created a genuine issue that the defendants deprived him of a liberty interest by not providing a name clearing hearing, and therefore no procedural due process rights exist.

### 3. Equal Protection Claim

Dr. Nichols next contends that he is the victim of invidious discrimination in violation of the Equal Protection Clause because the University irrationally and arbitrarily denied him procedures afforded to university employees accused of harassment/discrimination. The Equal Protection Clause of the Fourteenth Amendment of the Constitution directs states to treat "all persons similarly situated" alike. *See Vera v. Tue*, 73 F.3d 604, 609 (5th Cir. 1996). Violation requires intentional discrimination with no rational basis for the difference in treatment. *Engquist v. Oregon Dep't of Agric. et. al.,* 128 S.Ct. 2146, 2153 (2008)(citing *City of Willowbrook v. Olech*, 528 U.S. 562, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000)).

While most Equal Protection claims involve treating one distinct class of people differently from others, some courts have recognized a "class of one" theory of equal protection. *See City of Willowbrook v. Olech*, 528 U.S. 562, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000). However, the United States Supreme Court has recently determined that "class of one" Equal Protection claims are "a poor fit in the public employment context" because employment decisions "by their nature involve discretionary decisionmaking based on a vast array of subjective, individualized assessments." *Id.* at 2154-55. "[R]ecognition of a class-of-one theory of equal protection in the public employment context– that is, a claim that the State treated an employee differently from others for a bad reason, or for no reason at all– is simply contrary to the concept of at-will employment." *Id.* at 2156.

Because of the Supreme Court's ruling in *Engquist*, Dr. Nichols Equal Protection claim must fail. Dr. Nichols argues that he did not call his claim a "class-of-one" Equal protection claim in his complaint, but he has not delineated a class of persons that the university has intentionally and arbitrarily denied access to USM's harassment/discrimination procedures. Nor has Dr.

Nichols presented evidence of similarly situated people who were actually treated differently. There is simply no factual basis for Dr. Nichols's Equal Protection claim.

### 4. First Amendment Retaliation Claim

To prove a retaliation claim based on the First Amendment, the plaintiff must prove: (1) he suffered an adverse employment action; (2) the speech involved a matter of public concern; (3) his interest in commenting on matters of public concern outweighs the University's interest in promoting efficiency; and (4) the speech motivated the adverse employment action. *Modica v. Taylor,* 465 F.3d 174, 180 (5th Cir. 2006). In 2006, The United States Supreme Court added an additional element: "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti v. Ceballos*, 547 U.S. 410, 421, 126 S. Ct. 1951, 64 L.Ed.2d 689 (2006). In determining if the speech involves a matter of public concern, the court must consider the "content, form, and context" of the speech. *Connick v. Myers*, 461 U.S. 138, 147, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). "Only final decision-makers may be held liable for First Amendment retaliation employment discrimination under § 1983." *Johnson v. Louisiana*, 369 F.3d 826, 831 (5th Cir. 2004).

First, the court must determine if Dr. Nichols was speaking as a citizen on a matter of public concern. Homosexuality and AIDS could generally be considered matters of public concern as they have been the center of intense public debate. However, determining whether Dr. Nichols was speaking as a citizen or in his official capacity is a more difficult task. On one hand, Dr. Nichols's duties as a University employee included giving voice lessons, not giving moral, sexual, or religious advice to his students, so his statements were not made pursuant to his official duties. Therefore, the content of the conversations with Lunsford, although tangentially

related to the challenges of New York City's entertainment industry, are best characterized as speech unrelated to Dr. Nichols's official duties.  However, the context and form of the statements lead to a contrary conclusion.  The statements were made in the classroom setting by a professor to a student, and the courts have consistently taken a broad view of what constitutes classroom speech that is not afforded protection under the First Amendment.  *See Morse v. Frederick*, 551 U.S. 393 (2007) (student-made sign promoting illegal drug use at off-campus, school-approved event constitutes school speech and is not protected by First Amendment); *Bethel School Dist. v. Fraser*, 478 U.S. 675 (1986)(student election speech to student body using sexual metaphor was not protected by First Amendment);  *see also Piggee v. Carl Sandburg College*, 464 F.3d 667 (7th Cir. 2006)(affirming dismissal of professor's First Amendment retaliation claim in case where she was non-renewed after distributing pamphlets on sinfulness of homosexuality to a gay student while serving as his instructor);  *Martin v. Parrish*, 805 F.2d 583 (5th Cir. 1986)(holding that First Amendment does not protect public college professor's use of profanity in the classrooom).  Because of its form and context, this speech is best characterized as speech made in Dr. Nichols's official capacity and is not afforded First Amendment protection.

Even were this court to concede that Dr. Nichols's speech was that of a citizen on a matter of public concern, Dr. Nichols has failed to demonstrate that his interest in making these comments outweighs the University's interest in promoting efficiency.   In considering USM's interest in efficient operations, the court can consider factors such as whether the speech disrupts the regular and successful operation of the enterprise, affects morale and discipline, fosters disharmony, impedes the performance of the employee's duties, or detrimentally impacts working relationships that depend on loyalty and confidence.  *See Rankin v. McPherson,* 483

U.S. 378, 388 (1987); *Connick v. Myers*, 461 U.S. 138, 151 (1983); *Pickering v. Board of Education*, 391 U.S. 563 (1968). In considering Dr. Nichols's interest in speech, the court must consider the right of faculty members "to engage in academic debates, pursuits, and inquiries and to discuss 'ideas, narratives, concepts, imagery, [and] opinions– scientific , political, or aesthetic– [with] an audience whom the speaker seeks to inform, edify, or entertain.'" *See Trejo v. Shoben*, 319 F.3d 878, 884 (7th Cir. 2003) (quoting *Swank v. Smart*, 898 F.2d 1247, 1251 (7th Cir. 1990)). Here, Defendants determined that Dr. Nichols's comments violated USM's sexual orientation harassment/discrimination policy, which was established to "foster an environment of respect for the dignity and worth of all members of the university community." Certainly USM had a strong interest in providing an academic environment free of discrimination and harassment. USM had to reassign Lunsford to another professor because Lunsford felt that it would be "extremely awkward" to continue his instruction with Dr. Nichols after his comments. This reassignment was a disruption to the music school's normal operations. Further, Dr. Nichols's comments harmed the student-teacher relationship between him and Lunsford, and perhaps between him and other students or faculty in the music school. In sum, the University has a strong interest in providing a learning environment that does not tolerate disrespect or contempt based on sexual orientation. Therefore, Dr. Nichols has not provided sufficient evidence to demonstrate that Defendants' actions violated his First Amendment rights.

### 5. Qualified Immunity Defense to § 1983 Claims

Since the plaintiff has failed to show a violation of a constitutionally protected right, the Defendants as individuals are immune from suit under § 1983. As previously stated, "government officials performing discretionary functions are protected from civil liability under the doctrine of qualified immunity if their conduct violates no 'clearly established statutory or

constitutional rights of which a reasonable person would have known.'" *Sorenson v. Ferrie*, 134 F.3d 325, 327 (5th Cir. 1998)(quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738, 73 L. Ed. 2d 396 (1982)). An employment decision is a classic discretionary function. *See, e.g., Levens v. Campbell*, 733 So.2d 753, 764 (Miss. 1999) ("duties as to employee hiring were discretionary"); *Staheli v. Smith*, 548 So.2d 1299 (Miss. 1989) (evaluation of personnel is a discretionary function); *Miss. Forestry Comm'n v. Piazza*, 513 So.2d 1242 (Miss. 1987).

Dr. Nichols has no evidence to support a violation of his substantive or procedural due process rights, his First Amendment rights, or his Equal Protection rights. Therefore, the Defendants cannot be held liable under § 1983.

## B. DR. NICHOL'S STATE LAW CLAIM

### 1. Breach of Contract

Defendants assert that Dr. Nichols cannot establish the essential elements for breach of contract as alleged in his complaint. In order to prevail on such a claim, the plaintiff has the burden of proving by a preponderance of the evidence: (1) the existence of a valid and binding contract; (2) that the defendant has broken, or breached it; and (3) that he has been damaged monetarily by the breach. *Warwick v. Matheney*, 603 So.2d 330, 336 (Miss. 1992).

In this case, Dr. Nichols was allowed to finish out his contractual term of employment. Even if Dr. Nichols is contending that the breach of his contract was denying him the handbook procedures, which are incorporated into his employment contract, the court still does not find a breach. As previously stated, Dr. Nichols has pointed to procedures that are available to victims of harassment/discrimination, not the accused. These procedures were not implemented to create a due process right for a non-tenured professor to challenge his non-renewal.

Finally, the court notes that Dr. Nichols's employment contracts are between him and the Mississippi Board of Trustees of the State Institutions of Higher Learning. The Board is the sole and only contracting authority under Mississippi Constitution Art. 8, § 213-A, and Mississippi Code Annotated § 37-101-15. All USM employment contracts are subject to final approval by the Board. The Board is not named as a defendant in this case, and none of the other named Defendants are in privity of contract with Dr. Nichols. Therefore, the court finds that Dr. Nichols cannot show that Defendants breached his contract of employment.

## 2. Mississippi Due Process Clause

As discussed above, the non-renewal of Dr. Nichols, a non-tenured professor, was not a deprivation of a property or liberty interest meriting due process. Regardless, the actions by Defendants were discretionary and therefore, they are individually and officially immune from suit.

## IV. CONCLUSION

In conclusion, USM and the other Defendants in their official capacities, are immune from suit for damages under § 1983 and thus, summary judgment is appropriate for all these claims. Further, the Defendants are immune from suit in their individual capacities under qualified immunity because there was no clear violation of constitutional rights. First, Dr. Nichols does not have property interest in continued employment or a hearing under the University's policies and Dr. Nichols does not have a liberty interest that mandates a name clearing hearing. Second, Dr. Nichols has not proven a violation of Equal Protection because he has failed to show that he is a member of a class that has been treated differently from others similarly situated. Third, Dr. Nichols has failed to establish retaliation in violation of his First Amendment rights, because

USM had a substantial interest in prohibiting its employees from discriminatory or harassing speech while working in their official capacities. Thus, summary judgment is properly granted to all Defendants in their individual capacities for all claims arising under § 1983.

Finally, the breach of contract claim fails because Dr. Nichols was allowed to complete the full term of his contract and he has not sued the party in privity of contract with him.

IT IS THEREFORE ORDERED AND ADJUDGED that the Motion for Summary Judgment [Doc. #44] filed on behalf of the defendants is hereby granted and the plaintiff's complaint is dismissed with prejudice as to all defendants. Any other pending motion is denied as moot. A separate judgment shall be entered herein in accordance with FED.R. CIV. P 58.

SO ORDERED AND ADJUDGED this the 26th day of October, 2009.

*s/Keith Starrett*
UNITED STATES DISTRICT JUDGE